IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| PRAETORIAN INSURANCE COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 4:06-cv-1550-RBP |
| ) | |
| SNL DISTRIBUTION SERVICES ) | |
| CORPORATION AND ACE ) | |
| AMERICAN INSURANCE COMPANY, ) | |
| ) | |
| Defendants ) | |

## MEMORANDUM OPINION

This cause comes on to be heard on SNL Distribution Services Corporation's Motion to Dismiss Tort Claims Asserted in Plaintiff's First Amended Complaint filed on July 16, 2007.

Facts and Contentions[1]

This case arises out of the settlement of an earlier case, filed on September 19, 2005 in the Circuit Court of Tallapoosa County, Alabama,[2] *Bearden v. Personnel Staffing Inc.* ("PSI"[3])*, et al.*, (CV-2005-199), which concerned the death of SNL[4] employee Bert Willis in a traffic

---

[1] The "facts" were asserted in earlier filings. The court will note factual disputes. Since ACE has incorporated all SNL filings by reference, SNL's position as to purported facts outlined in this section is construed to be ACE's position as well unless otherwise noted. Some of SNL's disputes appear to be of the "knee jerk" variety. Earlier motions of the parties were denied.

[2] ACE lists the venue for the *Bearden* action as the Circuit Court of Calhoun County, Alabama.

[3] PSI is a company that coordinates the assignment of employees seeking part-time employment to employers offering such opportunities.

[4] Praetorian describes SNL as "a commercial trucking company that operates primarily as a logistics company for Flowers Bakery, whereby SNL hauls Flowers' products in SNL's commercial trucks," and identifies the Wendy's fast-food chain as a representative client. SNL denies this characterization.

1

accident.

In April 2005, Jacques DeWayne Hendon ("Hendon") was hired by PSI to serve as a temporary SNL driver.  SNL is the entity that finally decided Hendon would drive an SNL vehicle, that supervised him, that assigned him to his routes (including the route he was driving when the *Bearden* accident occurred), and that provided the vehicle, equipment, fuel, and guidance for the route it was traveling when the *Bearden* accident occurred.[5]  On July 27, 2005, Hendon, accompanied by SNL employee Bert Willis, was driving an SNL tractor trailer truck that was ultimately involved in an accident that claimed the life of Willis.  At the time, Hendon and Willis were on an SNL delivery route.[6]  Subsequent to the accident, Hendon twice tested positive for cocaine following drug screenings by the hospital and the Alexander City Police Department.[7]

On September 19, 2005, Deanna Bearden, the Administratix of Willis's estate, filed the aforementioned *Bearden* lawsuit in the Circuit Court of Tallapoosa County, Alabama against Hendon, PSI, Zurich American Insurance Company ("Zurich"), and fictitious parties, alleging sundry claims of negligence against all defendants.[8]  PSI requested defense and indemnity from SNL, Praetorian, ACE, and Zurich.  In October 2005, SNL's attorney, Charles Fleming, responded to PSI's demand for defense and indemnification by apparently accepting the tender

---

[5] Although acknowledging that an SNL employee sent Hendon to PSI for the purpose of eventually hiring Hendon to serve as a SNL temporary driver, SNL emphasizes that it was relying on PSI to screen Hendon before he would be hired for this position.  SNL also denies that it controlled Hendon to the extent articulated here.

[6] SNL, asserting a lack of knowledge, denies this.

[7] SNL, asserting a lack of knowledge, denies this.

[8] SNL, asserting a lack of knowledge, denies this.

on SNL's behalf.[9] PSI had an allegedly valid[10] indemnity agreement[11] (hereinafter the "Hold Harmless Agreement," or "HHA") with SNL and an indemnity agreement pursuant to an insurance policy with Praetorian. ACE had an indemnity agreements with SNL,[12] and Zurich was

---

[9] Praetorian asserts that on October 7, 2005 it tendered the demand via letter referencing the HHA and making a formal demand that SNL accordingly defend and indemnify PSI. It further alleges that attorney Fleming responded – and accepted the tender, also by letter, on October 13, 2005. SNL disputes that Fleming was SNL's "'then-attorney' for the purposes of binding SNL to the [HHA]."

[10] SNL argues that the HHA is invalid because it was signed by Ginger Davis, a secretary who lacked the authority to bind SNL. It alleges that, from the time SNL began using PSI employees as drivers circa June 2003, PSI repeatedly asked SNL President Jack Johnson to sign an indemnity agreement. Mr. Johnson apparently refused to do so each time. SNL argues that the HHA in question here was faxed to Ms. Davis in January of 2005, signed by her, and returned to PSI, all without Mr. Johnson's knowledge or authorization. Praetorian contends that Davis had the authority to bind SNL, and, even if she did not, that SNL is estopped from denying the HHA's validity based on its failure to timely object. Its amendment adds other claims regarding the HHA.

[11] Praetorian maintains that the HHA is the "only written contract" between PSI and SNL. SNL denies this. It also denies that the full text of the HHA is reflected in the following excerpt offered by Praetorian:

> HOLD HARMLESS AGREEMENT
>
> [PSI] acknowledges the request and need for certain employees of PSI...to handle currency or drive a company vehicle and will document applicable job description to reflect this duty. Upon the employees passing the hiring criteria and your company's consent, [PSI]...requests that a copy of your company's liability insurance be forwarded before our employee is allowed to drive a company vehicle or handle currency.
>
> As a reminder, SNL Dist. Services Corp. will also agree to waive all rights to make a claim against [PSI]...and to relieve [PSI] ... from all liability and responsibility for any damage, loss, or expense which SNL Dist. Services Corp. incurs as a result of any temporary employees engaging in such activities, and SNL Dist. Services Corp. further agrees to indemnify and hold harmless [PSI]...against all claims, damages, bodily injuries, losses, and expenses, which might be caused as a result of the temporary employee engaging in any of these activities [driving a company vehicle or handling currency].

Praetorian further asserts, and SNL denies, that SNL never reserved the right to challenge the HHA or challenged its enforceability when it agreed to defend PSI in October 2005. SNL "further disputes the implication that any [HHA] was a precondition to PSI providing employees to SNL, as PSI had been providing SNL drivers since June of 2003 without any such agreement."

[12] At the time of the Bearden accident, SNL was covered by ACE pursuant to a Commercial Umbrella Liability Policy. The policy contained that following "Insuring Agreement":

> We will pay on behalf of the INSURED [SNL] all sums that the INSURED shall become legally obligated to pay as damages because of BODILY INJURY...to

3

SNL's insurance carrier.

After a failed attempt at mediation in June 2006, PSI requested that SNL, ACE, and Zurich participate in a settlement of the *Bearden* lawsuit.[13] When SNL and its insurers purportedly would not settle the case, PSI asked Praetorian, its own liability insurance carrier, to settle the case.[14] The *Bearden* lawsuit was ultimately settled on August 6, 2006. Zurich and Praetorian agreed to contribute to a settlement fund of $4.5 million to settle all claims against PSI in the *Bearden* suit. Praetorian's settlement contribution was $2,562,946.00.[15] Neither ACE nor SNL contributed any monies to the settlement.[16] Praetorian claims that it made this settlement contribution in order to "cap potential exposure for itself and its insured, PSI, as it was unclear whether Praetorian owed coverage under its liability insurance policy," doing so under a "full reservation of rights."[17] It maintains that it made these representations numerous times to the

---

which this policy applies that takes place during the POLICY PERIOD. The OCCURRENCE must take place in the COVERAGE TERRITORY." The scope of the ACE policy extends to "Any person or organization included as an Additional Insured in the UNDERLYING INSURANCE and for the full limits of liability shown therein, but only to the extent that such insurance is afforded said person or organization in the UNDERLYING INSURANCE.

Praetorian argues that both PSI and Hendon qualify as "insureds" within the meaning of the ACE policy.

[13] As to Praetorian's allegation that SNL refused to settle, SNL "disputes that it was ever asked to provide input as to what amounts, if any, should be paid to settle" *Bearden*. It concedes that ACE and Praetorian requested that SNL "waive certain substantive policy and defense rights, which SNL refused to do, relative to settlement."

[14] SNL denies this.

[15] Zurich and Praetorian reached a settlement agreement with Bearden. Zurich paid $1,937,054 (its policy limit) and Praetorian paid $2,562,946. SNL, asserting a lack of knowledge, denies this.

[16] Asserting a lack of knowledge, SNL denies this.

[17] SNL denies this. Praetorian also claims that it notified SNL of settlement negotiations, and offered it the chance to participate in them. SNL denies this. Praetorian further claims - and SNL denies - that both SNL and ACE were informed, both orally and in writing, that any contribution it made towards settlement was "not voluntary and was pursuant to a full reservation of its right to seek reimbursement" from defendants' insurers.

4

defendants.[18]

On August 7, 2006, having apparently been assigned PSI's indemnity claim,[19] Praetorian filed a Complaint for Declaratory Judgment in this court against PSI, SNL, and ACE pursuant to 28 U.S.C. §§ 2201, 2002[20] and Federal Rule of Civil Procedure 57.[21] Praetorian seeks relief in the form of

> (1) a determination and declaration that no coverage exists for the *Bearden* Lawsuit under the Policy of insurance issued by Praetorian to PSI, (2) a determination and declaration that the indemnity agreement executed by SNL applies to all claims in the *Bearden* lawsuit, (3) damages in the amount of $2,562,946.00, plus prejudgment interest, for breach of contract by SNL, and (4) a determination and declaration that ACE must indemnify PSI and

---

[18] Specifically, Praetorian claims that it sent a letter to SNL's counsel on August 4, 2006 (two days before the *Bearden* settlement), requesting that the parties communicate about the potential settlement that Praetorian therein described as being in the best interests of all parties, as well as advising SNL that Praetorian was not acting as a volunteer and would seek reimbursement for any contribution that it made towards settlement. SNL denies this. Praetorian claims that on August 1, 2006, it sent a letter to ACE's counsel, requesting ACE's participation in settlement discussions, and stating that Praetorian and PSI "reserve all rights they may have against SNL and SNL's insurers, including ACE." On August 2, 2006, ACE's counsel apparently responded by sending a letter to the attorneys for PSI, Praetorian, and SNL, stating that ACE felt that settlement of *Bearden* for any amount up to $7,000,000 dollars would be "reasonable." ACE further stated that any contribution it might make to a *Bearden* settlement would not be as a volunteer, that it would not subsequently be estopped from denying that it owed coverage arising out of the *Bearden* accident, and that it could seek to recover the full amount of its putative settlement contribution. SNL denies all of this based on a lack of knowledge, and ACE incorporated SNL's reply brief by reference.

[19] Praetorian argues that, as a consequence of contributing to the *Bearden* settlement on PSI's behalf, PSI's rights of recovery against ACE and SNL are assigned to it under the terms of the insurance policy between Praetorian and PSI, which provides in pertinent part:

> TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US
>
> If any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us.

Accordingly, Praetorian maintains that PSI assigned its claims against SNL and ACE to it. The defendants dispute this contention.

[20] Praetorian invokes this court's jurisdiction pursuant to 28 U.S.C. § 1332.

[21] Praetorian voluntarily dismissed PSI from this action on August 25, 2006.

5

>reimburse Praetorian, to the extent of ACE's policy limits, for the claims in the *Bearden* Lawsuit and the amount spent by Praetorian to settle the *Bearden* Lawsuit.

Praetorian also requests appropriate injunctive relief to effectuate a judgment in its favor, as well as attorneys' fees and costs.

<u>Discussion</u> <u>of</u> <u>Subject</u> <u>Motion</u>

The stated ground(s) for the instant motion are:

First, the plaintiff's new claims are predicated upon its status as the assignee of its insured, PSI, but tort claims are not assignable. Second, the allegations of the original Complaint and First Amended Complaint make clear that PSI suffered no damages as a result of the alleged torts and therefore had no tort claims to assign. Third, the plaintiff's respondeat superior theory fails because if Ginger Davis lacked authority to enter into contracts on behalf of SNL, then by definition she could not have been acting within the line and scope of her employment when she signed the Hold Harmless Agreement at issue.

The stated essence of the plaintiff's response is as follows:

First, both SNL and Davis argue that "tort claims are not assignable under Alabama law," and therefore that Praetorian "lacks standing to bring claims of misrepresentation." (Davis Motion, pp. 1-4); SNL Motion, pp. 2-3). SNL and Davis confuse subrogation and assignment. Alabama law expressly permits an insurance company to be *contractually* subrogated to its insured's tort claims against third-parties. Praetorian's complaint is based on this settled principle.

Second, SNL argues that "PSI suffered no damages to assign to the plaintiff" because Praetorian, not PSI, paid the settlement. (SNL's Motion, pp. 3-4). This issue was already raised by SNL *(and rejected by this Court)* in a previous Motion to Dismiss filed in response to Praetorian's original complaint. The argument should once again be rejected because Praetorian satisfied the settlement on behalf of PSI, as its insurer, and is therefore subrogated to PSI's rights by virtue of its insurance policy. The fact that payment was made by a collateral source does not defeat the claims.

Third, SNL argues that it "cannot be vicariously liable for [Ginger] Davis's signing the Hold Harmless Agreement," arguing that if Davis did not have authority to sign the agreement, SNL necessarily cannot be held liable under the doctrine of *respondeat superior*. However, the legal standard for whether an individual has actual or apparent authority to execute a contract and bind her employer to direct liability is altogether different from the legal standard for an employer's vicarious responsibility for the employee's tortious actions under *respondeat*

6

*superior*.  The Alabama Supreme Court has confirmed this principle.  Praetorian is entitled to pursue this theory of recovery.

The court directed that the parties provide the court with the top controlling cases upon which they rely.  Their citations and the comments of the court follow.

Defendants

1.  *Mt. Airy Insurance Company v. Doe Law Firm*, 668 So.2d 534 (Ala. 1995).

This case is clearly distinguishable.  The claim there was not based on the claim of the insured against a third party.  The claim was by the insurer against its insured to recover a prior payment from the insurer to the insured.  The distinction was made plain by the Doe Firm's argument as follows:

> In response, the Doe law firm argues that the opinions relied upon as authority by Mt. Airy are factually distinguishable from this case, because those opinions involve the doctrine of subrogation, where, says the Doe law firm, an insurer seeks reimbursement from a third party, rather than the insured, for money the insurer paid to its insured.  668 So. 2d at 537.

and the court's observation:

> The money Mt. Airy paid to the Doe law firm was not paid to compensate the firm for an injury caused by a third party; the policy benefits were paid to the Doe law firm to settle a third party's claim against the firm. Thus, it is clear that the doctrine of subrogation is not applicable and that the first certified question must be decided based on a determination of whether Mt. Airy's payment to the Doe law firm was "voluntary" or "involuntary."  668 So.2d at 537.

. . . . .

The cases relied upon by *Mt. Airy* are more apt to the facts of this case.  The Alabama Supreme Court stated:

> After thoroughly reviewing the two lines of cases cited by the parties, we conclude

that those cases relied on by the Doe law firm are controlling under the facts of this case. The Alabama cases relied upon by Mt. Airy focus on the doctrine of subrogation. Under that doctrine, when an insured has been paid insurance policy benefits by his or her insurer for an injury caused by a third party, once the insured has been fully compensated for the injury, the insurer succeeds to the rights of the insured in order to be reimbursed by the third party for the sum it has already paid to the insured. See *Powell v. Blue Cross & Blue Shield of Alabama*, 581 So.2d 772(Ala. 1990); *International Underwriters/Brokers, Inc. v. Liao*, 548 So.2d 163 (Ala. 1989) *Couch on Insurance 2d* § 61.1 (1983). One of the primary purposes of subrogation is to prevent an insured from recovering twice for a single injury. *Powell,* supra; *Liao,* supra.

> *Allstate Ins. Co. v. Amerisure Ins. Cos.,* 603 So.2d 961, 962 (Ala. 1992) (involving a claim by Amerisure that it should recover from Allstate the money it had paid to settle a third party's claim against an insured, when at the time Amerisure paid the claim it was disputed as to which of the two insurers owed the primary coverage; Amerisure phrased its claim against Allstate as one for indemnity or *equitable subrogation* ); *McGuire v. Wilson*, 372 So.2d 1297 (Ala. 1979) (involving a claim by a homebuilder and its insurer, seeking from the purchaser of a home reimbursement of money spent to repair the home after a fire damaged it while the purchaser was residing there under a lease provision in the real estate sales contract; this Court recognized the insurer's claim against the purchaser as one for *subrogation* ). 668 So.2d at 537.

2. *Alabama Farm Bureau Mutual Insur. Service v. Nixon*, 268 Ala. 271, 105 So.2d 643 (Ala. 1958) is also distinguishable.

The *Nixon* court stated:

Therefore, before we can apply the doctrine of subrogation we must determine that Buckelew has a valid claim against Nixon for the remainder of the purchase price and further at this point *275 we call attention to the proposition that this court has held that 'Subrogation is not a matter of strict right. It is of equitable origin, and dependent in its application upon the *facts of each particular case*. * * * And, while no general rule may be laid down as applicable to all cases, yet, to justify its application, it must appear that the enforcement of the doctrine will not only best serve the substantial purposes of justice, but also the true intention of the parties.' *Jefferson Standard Life Ins. Co. v. Brunson*, 226 Ala. 16, 17, 14 So. 156.

> If we should determine that Buckelew has a valid claim against Nixon for the remainder of the purchase price, this would mean that the court was in error in finding **646 that as between Buckelew and Nixon, Buckelew's insurance could be used to cancel Nixon's debt.  105 So.2d at 645-46.  (Emphasis added).

Again, *Nixon* is clearly distinguishable.  It would have been inequitable to have allowed the insurer to recover from *Nixon*, who was not apparently at fault, based upon a payment under a fire policy personal to Buckelew where he was insuring his "equity" in the property.  *Nixon* had nothing else to pay for.  The court further stated:

> Neither could the insurance company here have any right of subrogation because when Buckelew received the proceeds of the insurance he had no further claim against Nixon which would be enforced by a court of equity and thus there is no right to which appellant may be subrogated. Furthermore as we pointed out earlier in the opinion, subrogation is not a matter of right but may be applied only by the court in the interest of justice *and each particular case must stand or fall on its own facts*. We do not think that subrogation should be applied.  105 So.2d at 646 (Emphasis added).

In this case, the purported indemnity agreement was designed to cover the very loss sued upon in this case.

## Plaintiff

1.  *Pacific Mutual Life Ins. Co. v. Haslip*, 553 So.2d 537 (Ala. 1989).

While this case may be somewhat distinguishable, it has some general language helpful to the plaintiff.  This court has had some concern about whether an unauthorized agent merely signing an indemnity constitutes in and of itself fraud or misrepresentation. *Haslip* does state:

> When Lemmie Ruffin accepted the premium payments from his clients, the plaintiffs, he was in essence telling those clients that there was an existing policy in effect.

9

>Thus, Ruffin was misrepresenting an existing fact.
>
>. . . . .
>
>By accepting these premiums, Ruffin represented to the parties that their policies were both existing and current. 553 So.2d at 542.

It may be arguable here that by signing the indemnity agreement, the employee represented that she had authority to do so. The parties may wish to further research this specific issue. Obviously, the plaintiff will have to prove that it (justifiably?) (reasonably?) relied upon any misrepresentation. The general issue is one of fact.

2. *Todd v. Modern Woodmen of America*, 620 So.2d 595 (Ala. 1993).

This court would make the same general comments as with *Haslip*. The court further notes that the court held that Chambers had no authority to bind Modern Woodmen by contract.

3. *Washington National Insurance Company v. Strickland,* 491 So.2d 872 (Ala. 1985).

Same comments as above.

4. *Industrial Chemical & Fiberglass Corp. v. North Driver Ins. Co.*, 908 F.2d 825 (11th Cir. 1990).

The defendants take particular issue with this case on the basis that it involved the entry of a judgment rather than a settlement. This court does not believe that this distinction makes a difference. The issue is whether there was an accrued loss. *Industrial Chemical* suggest that the defendants' arguments are faulty in several respects. It held that the district court "misapplied controlling Alabama law in determining that the indemnity agreement ... extinguished the

damage ... ." 908 F.2d at 829. See also 908 F.2d at 83.

The court also stated:

To the extent the indemnity agreement is considered a payment, it is a third-party payment. Under the Alabama collateral source rule, payments to a plaintiff from third parties will not be considered in reduction of the plaintiff's damages, even if the payments are made to cover the very losses that are the basis of the plaintiff's claim. *Carlisle v. Miller*, 275 Ala. 440, 155 So.2d 689, 691 (1963); *Southeast Ala. Gas Dist. v. Taylor*, 614 So.2d 1050, 1052 (Ala. Civ. App. 1982). Indemnification agreements, like insurance agreements, come under the collateral *833 source rule. *See Taylor v. Mason*, 390 So.2d 1046, 1048 (Ala. 1980); *Robins Eng'g, Inc. v. Cockrell*, 354 So.2d 1, 2-3 (Ala. 1977); *Coffee v. Seaboard Sys. R.R., Inc.*, 507 So.2d 476, 478 (Ala. 1987). Collateral arrangements to pay for a loss do not extinguish or reduce the loss, regardless of how certain it would appear the collateral benefits may be. *Ensor v. Wilson*, 519 So.2d 1244, 1266-67 (Ala. 1988); *Jones v. Crawford*, 361 So.2d 518, 511 (Ala. 1978); *Gribble v. Cox*, 349 So.2d 1141, 1141, 1142-43 (Ala. 1977). 908 F.2d at 832-33.

5. *Nationwide Mut. Ins. Co. v. Hall*, 643 So.2d 551 (Ala. 1994) also supports the plaintiff's position. It notes that Nationwide sued as a subrogee of Friedlander. The trial court had held that the indemnity agreement upon which *Nationwide* sued as a subrogee was unenforceable. That ruling was reversed.

Although not presently at issue, *Nationwide* may provide aid during later proceedings with regard to:

(1) Its discussion of the language of an enforceable indemnity agreement; and

(2) Its discussion of primary and excess insurance coverage, etc.

The court concludes that the subject motion is due to be denied. Obviously, the court does not reach the ultimate merits of the claims or defenses.

This the 21st day of August, 2007.

*/s/ Robert B. Propst*

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**