IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| PRAETORIAN INSURANCE COMPANY, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>SNL DISTRIBUTION SERVICES )<br>CORPORATION AND ACE )<br>AMERICAN INSURANCE )<br>COMPANY, ET AL. )<br>)<br>Defendants. ) | Civil Action No.: 4:06-CV-1550-RBP |

MEMORANDUM OPINION

This cause comes on to be heard upon the Motion for Ruling on Applicable Legal Issue filed by Plaintiff Praetorian Insurance Co., (hereinafter "Plaintiff") on November 28, 2007.[1]

FACTS AND PROCEDURAL HISTORY[2]

Plaintiff issued a comprehensive liability policy to Personnel Staffing, Inc. ("PSI") that includes Commercial Auto Coverage (hereinafter CAC). The CAC has a $1 million policy limit. Plaintiff also issued a Commercial Liability Umbrella Policy to PSI with a $5 million policy limit (hereinafter "Umbrella Policy"). There is no coverage for SNL under either of the policies issued by Plaintiff.

Both Zurich American Insurance Company ("Zurich") and ACE American Insurance

---

[1] The parties have agreed that the issue should be considered as if the motion were a motion for summary judgment.

[2] Also see Memorandum Opinion filed on August 21, 2007.

1

Company ("ACE") issued liability insurance policies to SNL. The Zurich policy contains, among other things, automobile liability coverage and contractual liability coverage for insured contracts (i.e., indemnity agreements), and had an applicable policy limit of $2 million. The ACE policy provides $3 million in additional excess coverage. The Zurich policy's limits have been exhausted.

Deanna Bearden ("Bearden") filed a wrongful death lawsuit in the Tallapoosa County Circuit Court against PSI and others. The Bearden lawsuit arose out of the death of Bret Willis, who was a passenger in a SNL Distribution Services Corporation ("SNL") truck driven by PSI temporary employee Jacques Hendon.[3] On the eve of trial, the case was settled by Zurich and Praetorian for $4.5 million. ACE did not contribute to the settlement. Because SNL had allegedly agreed to indemnify PSI—pursuant to a Hold Harmless Agreement—for damages and bodily injuries caused as a result of a PSI temporary employee driving a company vehicle, Plaintiff (pursuant to subrogation and an assignment from PSI) seeks indemnity from SNL and ACE for its $2.563 million contribution to the Bearden settlement.[4]

## ISSUE FOR DECISION

Plaintiff requests the Court to decide the following legal issue:

> When both parties to an indemnity agreement have liability insurance, and the indemnitee's liability insurance carrier settles a lawsuit against the indemnitee, does the fact that the parties maintain liability insurance have any bearing on the

---

[3]Hendon came to work for SNL through PSI which is a staffing company that facilitates employment between businesses in need of part-time or temporary employees and prospective employees in search of employment. Hendon was technically an employee of PSI, but was doing work at the direction and under the control of SNL when the accident occurred.

[4]Plaintiff has multiple claims against SNL and ACE in this lawsuit. One of those claims is that SNL and ACE must reimburse Plaintiff for 100% of its settlement contribution by virtue of the Hold Harmless Agreement executed by SNL in favor of PSI. This motion only concerns that claim.

2

indemnitee's and its insurer's right to seek 100% reimbursement from the indemnitor and/or the indemnitor's carrier?[5]

### ARGUMENTS[6]

This dispute appears to center around the extent to which the *Nationwide* cases limit (or do not limit) Plaintiff's potential recovery in this case. *See Nationwide Mut. Ins Co. v. Hall*, 643 So.2d 551 (Ala. 1994) (hereinafter "*Nationwide I*"); *Alfa Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 684 So. 2d 1295 (Ala. 1996) (hereinafter "*Nationwide II*"). Plaintiff claims that the *Nationwide* cases do not carry any precedential value to the facts of this case, while Defendants claim that *the Nationwide* cases are dispositive of the issue. The Court will discuss the procedural history of the *Nationwide* line of cases before addressing the parties' specific arguments.

The *Nationwide* cases involve an agreement by which Hall hired Friedlander to manage an apartment building in Mobile, Alabama. In the management agreement, Hall agreed to indemnify Friedlander for liability relating to the property, and to carry liability insurance providing coverage for both Hall and Friedlander. In accordance with this agreement, Hall purchased liability insurance from Alfa that provided coverage for both Hall and Friedlander. Friedlander was also covered under its own policy with Nationwide.

In 1987, both Hall and Friedlander were sued in a wrongful death action arising out of a fire at the apartment building. After being sued, Friedlander requested indemnity and defense from both Hall and Alfa but received no response. After this rejection, Nationwide, in

---

[5] The question obviously relates to the subject policies and agreement in this case.

[6] This section summarizes the arguments made by the parties and does not necessarily reflect the conclusions reached by the court.

accordance with its policy, defended Friedlander and ultimately settled the claims against Friedlander. Alfa also settled the claims against Hall. Nationwide subsequently filed suit against Hall and Alfa to recover its settlement payment and attorneys fees and expenses.

The trial court initially entered summary judgment in favor of Nationwide, holding that since both the Alfa and Nationwide policies provided Friedlander with primary coverage, the two insurers were each obligated to contribute a pro rata share of the Friedlander settlement and defense liability. The trial court also entered summary judgment in favor of Hall based on a finding that the indemnity provision was unenforceable because it did not contain unambiguous language clearly expressing the parties' intent that Hall would indemnify Friedlander for the consequences of Friedlander's own acts of negligence.

On the first appeal (*Nationwide I*), the Alabama Supreme Court overturned the trial court's ruling that the indemnity agreement was unenforceable. *Nationwide I*, 643 So.2d at 557. The court then upheld the trial court's proration of liability between Alfa and Nationwide based on the conclusion that both provided primary coverage to Friedlander, the indemnitee. *Id.* at 558. The Court stated that "[w]hen two or more insurance carriers have primary insurance coverage of the same insurable interest, subject matter, and risk, they share liability in accordance with the proportion that the limits of each policy bear to the total limit of insurance applicable to the loss." *Id.* at 561. The Court noted that the "right to contribution is based on the principle that the paying insurer paid a debt owed by another, concurrently liable insurer. *Id.* at 561-62.

After the Alabama Supreme Court's decision in *Nationwide I*, the lawsuit was remanded to the trial court in order to determine the applicability of the indemnity agreement. *See Nationwide II*, 684 So. 2d at 1298. Following remand, the trial court entered summary judgment

4

against both Hall and Alfa. As to Hall, the trial court determined that it was bound by *Nationwide I* to enter a judgment against Hall for the balance of Nationwide's settlement payment not reimbursed by Alfa, and that Alfa, as Hall's insurer, was obliged to indemnify Hall for the amount of that judgment. In *Nationwide II*, the Supreme Court reversed the judgment against Hall, finding that the indemnity agreement was ambiguous as to whether he had to indemnify Friedlander (that is, pay Nationwide) out of his personal assets (as opposed to insurance coverage). *Id.* at 1299-1301. The Court also reversed the summary judgment against Alfa, and stated, "[t]he law of this case as established in *Nationwide I*, prohibits a second recovery by Nationwide from Alfa under any theory." *Id.* at 1302.

**Liability Assuming the Hold Harmless Agreement is Valid.**

This lawsuit is before this Court on the basis of federal diversity jurisdiction, and Alabama law controls the substantive issues. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

A.   **Plaintiff's Position.**

Plaintiff argues that the Eleventh Circuit, as well as other jurisdictions, have consistently determined that an indemnitee's liability insurance carrier is entitled to 100% reimbursement from an indemnitor and the indemnitor's carrier, unless otherwise provided in the indemnity agreement.

To support this argument, Plaintiff relies on *U.S.F.&G. v. St. Paul Fire and Marine Ins. Co.*, 1996 WL 33155570 (S.D. Ala. 1996) (hereinafter "*St. Paul I*"), *reversed on other grounds*, *St. Paul Fire and Marine Ins. Co. v. U.S.F.&G.*, 1998 WL 34374427 (11th Cir. 1998) (hereinafter "*St. Paul II*"). In *St. Paul I*, the Court addressed whether USF&G could recover

100% reimbursement of a $525,000 settlement that it paid on behalf of its insured, International Paper, in a wrongful death lawsuit. Although USF&G issued liability insurance to International Paper, another company, BE&K, had executed an indemnity agreement in favor of International Paper. *St. Paul I*, 1996 WL 33155570 at *1.

USF&G sought reimbursement pursuant to the indemnity agreement and St. Paul responded by arguing that coverage issues trumped the indemnity agreement, i.e., that the St. Paul policy provided excess coverage to International Paper and that USF&G's policy was primary. The court held that the discussion about primary and excess coverage was irrelevant because the indemnity agreement entitled USF&G to full reimbursement:

> The crucial issue, then, is not whether the respective policies afford primary or excess coverage to International Paper, but whether the indemnity clause of the International Paper/BE&K agreement is enforceable. If it is, then International Paper was never "legally obligated" to pay damages in the wrongful death case, and that legal obligation rests squarely on BE&K's shoulders. As the St. Paul policy expressly provides coverage to BE&K for any such legal obligation that exists, St. Paul would be required to pay the settlement costs of the state wrongful death action in such a scenario.

*Id.* at *4.

Although the Eleventh Circuit reversed the lower courts decision, *see St. Paul II*, Plaintiff claims that the reversal was on different grounds. Moreover, Plaintiff argues that the Eleventh Circuit expressly agreed with the lower court's analysis of insurer responsibility if the indemnity agreement was enforceable:

> St. Paul argues that it is not liable since it is the excess carrier. However, the policies clearly indicate that USF&G is the primary carrier, and St. Paul the excess carrier, with respect to International Paper only. With respect to BE&K, all coverage is provided by St. Paul. International Paper was indemnified by BE&K for all personal injury claims arising from the construction project. If the indemnification agreement is enforceable, then the question of whether St. Paul is

> International Paper's primary or excess carrier becomes moot. Under the indemnification agreement, only BE&K would be liable and USF&G, which has not insured BE&K, would owe no coverage.

*St. Paul II*, 1998 WL 34374427 at *2.

Based on this language, Plaintiff claims that if this court ultimately determines that the Hold Harmless Agreement is enforceable, the extent to which the respective insurance policies extend coverage will be largely immaterial, and the legal obligation to pay damages in the Bearden wrongful death case will rest "squarely" on SNL and ACE. Plaintiff contends that because ACE's policy is the only relevant policy that provides coverage to SNL for any such legal obligation, ACE will be required to reimburse Plaintiff for all the settlement costs. Thus, Plaintiff's policy is not implicated in this issue, and there is no pro rata sharing if the Hold Harmless Agreement is valid.

Plaintiff also argues that other jurisdictions addressing this issue would also reject Defendants' arguments. For example, in *Cont'l Cas. Co. v. Auto-Owners Ins. Co.*, 238 F.3d 941 (8th Cir. 2000), the Eighth Circuit addressed the issue of how an indemnity agreement between two corporations affects the apportionment of liability between their respective insurers. In that case, an employee of Fitzsimmons Service Company was injured while performing salvage work for which Burlington Northern had hired Fitzsimmons. *Id.* at 943. As part of the contract to perform work, Fitzsimmons agreed to indemnify Burlington Northern "for sums that it had to pay on account of injuries arising from Fitzsimmons's work." *Id.* at 944. Auto-Owners Insurance Company ("Auto-Owners") was the general liability carrier for Fitzsimmons, and Interstate Fire and Casualty Company ("Interstate") provided insurance coverage for Burlington Northern.

After settlement, the insurance companies sought a declaratory judgment to determine

how they should apportion the costs of the settlement. *Id.* at 943. The Eighth Circuit found that "[t]he issue in [this] case is what insurer or insurers, under all of the relevant contracts, must ultimately pay Burlington Northern's portion of the settlement. . . ." *Id.* at 946. In determining this issue, the court held that, because of the indemnity agreement, Auto-Owners was responsible for the entire loss.

Plaintiff also cites other cases to support its position. *See, e.g., Am. Indem. Lloyds v. Travelers Prop. & Cas.,* 335 F.3d 429 (5th Cir. 2003) (recognizing that an applicable indemnity agreement between insureds shifts the entire loss to the indemnitor insured notwithstanding the existence of an "other insurance" clause in the indemnitor's policy); *Wal-Mart Stores, Inc. v. RLI Ins. Co.,* 292 F.3d 583 (8th Cir. 2002) (holding that, because of an indemnity clause, the insurer of an indemnitor must "bear the entire loss" of a settlement and noting that a leading commentator on insurance law has recognized that an indemnity agreement between insureds, or a contract with an indemnification clause, may shift an entire loss to a particular insurer) (citing 15 *Couch on Insurance* (3rd Ed. 1999)); *North Central Airlines, Inc. v. City of Aberdeen,* 370 F.2d 129 (8th Cir. 1966) (landlord's insurance coverage in no way affected underlying obligation of tenant to indemnify landlord).

Finally, Plaintiff argues that ACE's reliance on the *Nationwide* line of decisions is misplaced. Plaintiff claims that the *Nationwide I* case addressed several issues, three of which Plaintiff claims are relevant.

> • First, the court held that the indemnity agreement was not "unenforceable as a matter of law" with respect to claims involving the indemnitee's own negligence. *Nationwide I,* 643 So. 2d at 555-57. In *Nationwide I,* the court did not hold that the agreement was enforceable as a matter of law, but rather remanded the case to the trial court to determine its enforceability. *Id.*

· Second, the court held that the circuit court properly prorated the amounts that Nationwide and Alfa were obligated to contribute to the claims against Friedlander. *Id.* at 557. This part of the court's holding was based upon the fact that Friedlander was an insured under the policies issued by both Nationwide and Alfa. *Id.* at 561 ("[b]ecause we have concluded that both the Alfa policy and the Nationwide policy provide primary insurance to Friedlander, the issue becomes whether the circuit court properly adjudicated the insurers' respective obligations to pay pro rata portions of the Friedlander settlement. *When two or more insurance carriers have primary insurance coverage of the same insurable interest, subject matter, and risk, they share liability in accordance with the proportion that the limits of each policy bear to the total limit of insurance applicable to the loss.*") (Emphasis added).

· Third, the court held that the fact that Alfa had already exhausted its policy limits did not prevent pro rata recovery. *Id.* at 562 ("when, as in this case, an insurer insures two or more parties for the same insurable interest, subject matter, and risk and when it pays the limits of its policy to one of its insureds with notice of an adverse claim by another, the insurer does so at its own risk and may be liable to another insurer of its insured for a pro rata contribution, notwithstanding the limits of its policy").

Thus, Plaintiff argues that the *Nationwide I* holding on the pro rata issue dealt specifically with Nationwide's claim that Friedlander was an additional insured under the Alfa policy, and had nothing whatsoever to do with the indemnity agreement.

Plaintiff also argues that the Alabama Supreme Court's ruling in *Nationwide II*, that Nationwide could not recover more than a pro rata share from Alfa, has no precedential value to this case. Plaintiff claims that the *Nationwide* decisions make it clear that, to the extent the indemnity agreement is enforceable, at a minimum the indemnitor (here SNL) must reimburse the indemnitee for 100% of the settlement amount. Plaintiff bases this position on the fact that in *Nationwide II*, the Court remanded the case to the trial court to decide whether Nationwide was entitled to 100% reimbursement from Hall, the indemnitor.

**B.   Defendants' Response.**

Defendants argue that a valid, enforceable Hold Harmless Agreement would not automatically shift all liability to SNL and ACE. Instead, Defendants claim that ACE's potential exposure to Plaintiff is limited to its pro rata share of the settlement payment as an excess insurer. Defendants contend that the Alabama Supreme Court's decisions in *Nationwide I*, and *Nationwide II* are dispositive of the issue. It claims that under these cases, even if the Hold Harmless Agreement is valid and enforceable, liability for the Bearden settlement should be prorated between Plaintiff and ACE.

The crux of the disagreement between the parties centers on whether and to what extent the *Nationwide* cases limit Plaintiff's potential recovery in this case. Defendants' position is that the Alabama Supreme Court intended to limit Alfa's liability to the pro rata contribution, regardless of the indemnity obligation. To support this claim, Defendants state that the Court entered an order in *Nationwide II*, before the indemnity issue was resolved, that precluded the possibility of Alfa ever having to reimburse Nationwide for the entire settlement payment.[7] It claims that the only conclusion to be reached from *Nationwide I* is that the validity of the indemnity agreement was not relevant to Alfa's liability. While Plaintiff contends that the Court's decision in *Nationwide II* was dependent on the decision to invalidate the indemnity agreement, Defendants argue that nothing in the opinion supports the argument that SNL and ACE would, **as a matter of law**, be obligated to reimburse Plaintiff for the balance of the settlement payment above ACE's contribution.

Also, Defendants claim that other courts would support a pro rata apportionment of

---

[7]Plaintiff argues that the indemnity issue had not been resolved based on the fact that the Alabama Supreme Court remanded the case for a jury to decide the amount which Nationwide was entitled to recover from Hall. *See Nationwide II*.

liability between Plaintiff and Defendants. In *JPI Westcoast Constr., L.P. v. RJS & Assocs., Inc.*, 2007 WL 3122522 (Cal. Ct. App. Oct. 26, 2007), the California Court of Appeals made a distinction between primary insurers and excess insurers. In the case, a construction contract between a general contractor (JPI) and a subcontractor (RJS) included an indemnity provision in favor of JPI. An employee of RJS was killed, and his family sued JPI and RJS, both of which were defended by RJS's insurer. After the jury returned a substantial verdict against the defendants, JPI and RJS settled the lawsuit. Litigation over each insurer's contribution to the settlement ensued. Both JPI and RJS had primary liability policies, and JPI was listed as an additional insured on RJS's primary policy. RJS was also insured under an excess policy. JPI asked the court for a declaratory judgment that RJS and its insurers were obligated to fully indemnify JPI. The court acknowledged that an earlier California case "stands for the proposition that an insurer's subrogation of its insured's right to contractual indemnification controls in a battle of 'other insurance' clauses between co-insurers." *Id.* at *7. However, the court found the fact that the prior case involved a dispute between two primary insurers to be a "key distinction," and held that JPI's primary carrier was not entitled to indemnification from RJS's excess carrier based on the indemnity provision in the construction contract. *Id.* at *8, *12. The court reasoned that "excess insurance is . . . expressly understood by both the insurer and insured to be secondary to specific underlying coverage which will not begin until after that underlying coverage is exhausted and which does not broaden that underlying coverage." *Id.* at *8 (citations omitted). "The risks involved in providing primary coverage are different from those involved in issuing an excess policy." *Id.* at *10. "Nothing prevented JPI from calling for a much higher level of primary insurance from its subcontractors if it was concerned about

11

protecting the interests of its own primary insurers." *Id.* at *11. The court also reasoned that there was no evidence that JPI's primary insurer calculated its premiums based on the understanding that its coverage would be secondary to that of RJS's excess carrier. *Id.*

JPI is consistent with *Reliance Nat'l Indem. Co. v. Gen. Star Indem. Co.*, 85 Cal. Rptr. 2d 627 (Cal. Ct. App. 1999), which involves a dispute between an indemnitee's primary insurer and an indemnitor's excess insurer concerning allocation of the costs of defending and settling a lawsuit filed against both the indemnitor and the indemnitee. The court held that the indemnitee's primary carrier was not entitled to contribution from the indemnitor's excess carrier: "These insurers do not share the same level of coverage and there is no right of contribution established." *Id.* at 637. "The contractual terms of insurance coverage are enforced whenever possible." *Id.* at 634. "As a general rule, there is no contribution between a primary and an excess carrier." *Id.* at 635 (citations omitted). The court reasoned, "[t]his is not a case between two primary carriers which have each received premiums for bearing the loss which ultimately occurred; rather, this is an action between an excess and a primary carrier." *Id.* at 639. "The risks involved in providing primary coverage are different from those involved in issuing an excess policy. These differences are reflected in part by the premium costs." *Id.* at 638. The court noted the absence of any evidence that the indemnitee's primary carrier had calculated its premiums based on an understanding of the indemnity agreement. *Id.* at 639.

Defendants argue that the same reasoning should apply to Plaintiffs's claims against ACE. Plaintiff provided both primary and excess coverage to PSI, whereas ACE provided

only excess coverage to SNL.[8]

Finally, Defendants argue that the authorities cited by Plaintiff are "not controlling and cannot trump the *Nationwide* cases." (Doc. 92 at 11.) Defendants point out that the primary authorities that Plaintiff relies upon are an unreported case that has been overruled in part (*St. Paul I*) and an unreported Eleventh Circuit case which has recently been questioned (*St. Paul II*). Defendants also argue that the Court should distinguish *Am. Indem. Lloyds v. Travelers Prop. & Cas. Ins. Co.*, 335 F.2d 429 (5th Cir. 2003), and *Continental Cas. Co. v. Auto-Owners Ins. Co.*, 238 F.3d 941 (8th Cir. 2000), because these decisions address issues relating to the proper apportionment of liability between primary carriers. Defendants also claim that *Wal-Mart*, 292 F.3d at 588, expressly acknowledges that indemnity agreements do not always govern insurance allocation issues.

C.  **Plaintiff's Reply.**

In response to Defendants' brief, Plaintiff emphasizes that "[t]he *Nationwide* decisions are simply inapplicable to this issue." (Doc. 94 at 2.) Plaintiff argues that the language of *Nationwide II* (that *Nationwide I* prohibits Nationwide from recovering from Alfa under any theory) was mandated by the court's previous decision in *Nationwide I*. As opposed to setting forth a general statement of law regarding the apportionment of liability, Plaintiff claims that the *Nationwide II* court simply did not address the issue. Plaintiff claims that relying on the *Nationwide* line of cases "requires speculation and conjecture as to the court's unexpressed

---

[8]While Defendants' brief indicates that these California cases demonstrate that other courts support pro rata apportionment of liability, the cited cases do not appear to discuss that proposition.. In actuality, Defendants appear to be using the California cases to argue that a primary carrier has no right of contribution from the excess carrier. Nothing in the *Nationwide* line of cases appears to require that "[c]overage disputes between primary and excess carriers must be analyzed differently, even when an indemnity agreement is in effect." *See* Doc. 92 at 8. *Nationwide* does not appear to follow the reasoning from the California cases.

motivations." *Id.* at 3. Instead, Plaintiff argues that the Court should follow the case law of other jurisdictions.

Plaintiff also attacks *JPI Westcoast Constr. LP v. RJS & Assoc., Inc.*, 68 Cal. Rptr. 3d 91 (Cal. Ct. App. 1st Dist. 2007) and *Reliance Nat'l Indem. Co. v. Gen. Star Indem. Co.*, 85 Cal. Rptr. 2d 627 (Cal. Ct. App. 2d Dist. 1999) (hereinafter "the California cases"). Plaintiff claims that the arguments made in the California cases have been specifically rejected by the Eleventh Circuit. In *St. Paul II*, the Eleventh Circuit observed:

> St. Paul argues that it is not liable since it is the excess carrier. However, the policies clearly indicate that USF&G is the primary carrier, and St. Paul the excess carrier, with respect to International Paper only. With respect to BE&K, all coverage is provided by St. Paul. International Paper was indemnified by BE&K for all personal injury claims arising from the construction project. If the indemnification agreement is enforceable, then the question of whether St. Paul is International Paper's primary or excess carrier becomes moot. Under the indemnification agreement, only BE&K would be liable and USF&G, which has not insured BE&K, would owe no coverage.

*St. Paul Fire and Marine Ins. Co. v. U.S.F.&G.*, 1998 WL 34374427, *2.

Plaintiff also cites other cases which it claims to be in conflict with the California cases. For example, in *St. Paul Fire & Marine Ins. Co. v. American Specialty Lines Ins. Co.*, 365 F.3d 263 (4th Cir. 2004), the court, predicting Virginia law, concluded that an applicable indemnification agreement controls the allocation of liability between the insurers of the indemnitee and the indemnitor. In reaching its decision, the Fourth Circuit relied heavily on the Eighth Circuit's decision in *Wal-Mart Stores, Inc. v. RLI Ins. Co.*, 292 F.3d 583 (8th Cir. 2002). The Fourth Circuit declined to follow the decisions in the California cases and stated that:

> all indications are that most, if not all, jurisdictions to have faced the question of whether an indemnification agreement could relieve particular insurers of an obligation to pay, without resort to a separate action to enforce the

> indemnification agreement, have answered in the affirmative. . . . In particular, the *Wal-Mart Stores* court thoroughly canvassed the relevant precedents in determining that the majority of jurisdictions having addressed the subject apply an indemnification agreement between parties in determining the factually-related obligations of insurers to cover those parties' liabilities, see id. at 588. In fact, the court identified only one contrary case involving insureds bound by an indemnification agreement, *id.* at 591 (*citing Reliance Nat'l Indem. Co. v. General Star Indem. Co.*, 72 Cal. App. 4th 1063 (1999)), and noted that the case was itself in apparent conflict with an earlier decision of the Supreme Court of California. *See id.* at 592 (*citing Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 13 Cal. 3d 622 (1975)). . . . [W]e believe that the cases and principles relied on in Wal-Mart Stores, and applied herein, represent general practices and the majority position on the respective issues, *see id.* at 589 n. 1 (reaching similar conclusion), and would be adopted by the Supreme Court of Virginia in the appropriate case.

*St. Paul*, 365 F.3d at 272-73 and n. 5.

In short, Plaintiff argues that the vast majority of courts around the country agree that the indemnitor's liability insurance carriers must bear the entirety of losses covered by the indemnity agreement, notwithstanding the fact that the indemnitee also purchased liability insurance coverage.

Finally, Plaintiff argues that the Court's adoption of Defendant's position would lead to "circular" litigation. Plaintiff claims that Defendant's position leads to circular litigation because after being found fully liable, the indemnitor would simply sue its insurance carrier for coverage. Because ACE has acknowledged, in response to Plaintiff's Interrogatories, that it has "an obligation to defend and indemnify SNL in this lawsuit," if a judgment is ultimately rendered against SNL requiring it to reimburse the full amount of Plaintiff's settlement contribution, in the absence of payment by ACE there will be an action by SNL against ACE to require ACE to pay the judgment. Plaintiff claims that Defendants' arguments should be rejected because they will only lead to circular litigation.

## CONCLUSIONS OF THE COURT

The court concludes that the *Nationwide* cases are clearly distinguishable and that the reasoning in the *USF&G/St. Paul* opinions is compelling.

In *Nationwide*, the Alfa policy also covered Friedlander based on an agreement that Hall provide such coverage. Here, there was no agreement for SNL to provide such coverage to PSI and SNL did not provide such coverage through ACE or otherwise. While ACE makes the argument in paragraph 3 of the attached Exhibit A, that paragraph refers to "OTHER INSURANCE" being "available to the INSURED ... ." In paragraph 1, ACE acknowledges that PSI is not an "insured" under its policy. This appears to be a "have cake and eat it also" argument.

Further, regardless of whether Nationwide slipped up by not attempting to get the state appellate court to clarify its first decision or whether the second decision should or should not have found that the first decision was the law of the case, the second decision clearly held that the first decision foreclosed further consideration of the issue as to Alfa even though the enforceability of the indemnity agreement had not been determined at the time of the first decision. There was not a substantive ruling in *Nationwide* applicable to this case.

As stated, this court finds that the quoted statements in the *USF&G/St. Paul* cases are persuasive. PSI was not required to obtain liability insurance. If PSI's indemnification agreement is enforceable, the Praetorian coverage was voluntary and surplusage. The ultimate outcome should be no different than if PSI had had no separate coverage.

This the 23rd day of January, 2008.

*[signature: Robert B. Propst]*
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**



"Keith Hamilton"
<khamilton@bainbridgemims.com>
01/17/2008 03:47 PM

To &lt;Robert_Propst@alnd.uscourts.gov&gt;

cc &lt;Sharon_Lawley@alnd.uscourts.gov&gt;, &lt;tlowther@balch.com&gt;, &lt;davis@middlemaslaw.com&gt;, &lt;reubanks@bainbridgemims.com&gt;

bcc

Subject RE: Praetorian v SNL and ACE

*Exhibit A*

Dear Judge Propst:

On behalf of SNL and ACE, I submit the following responses to your email of January 15:

   1.  The ACE policy does <u>not</u> specifically purport to provide coverage to PSI. ACE contends that the only potential coverage available to PSI is through the "Insured contracts" provision, which depends on a determination that the alleged indemnity agreement between PSI and SNL is valid and applies to the underlying claims. PSI is not a named insured in the ACE policy, and ACE does not agree that coverage is available to PSI under Praetorian's "additional insured" argument, even if PSI were considered an additional insured. Among other things, the Zurich policy excludes coverage for injuries to an employee of an insured "arising out of and in the course of: (1) Employment by the 'insured'; or (2) Performing the duties related to the conduct of the 'insured's' business." The exclusion does not apply in the insured contract situation, but otherwise, it does. Since the underlying lawsuit arose from the on-the-job death of an SNL employee, the Zurich policy would not provide coverage to PSI, other than pursuant to the "Insured contracts" provision. In addition, the fact that Zurich (SNL's primary carrier) defended PSI in the underlying lawsuit, whether under the "insured contracts" or the "additional insured" provision, is not binding on ACE as the excess carrier.

   2.  The alleged indemnity agreement does <u>not</u> expressly purport to require SNL to provide insurance coverage to PSI. The agreement does request that SNL provide PSI with a copy of its liability insurance.

   3.  ACE's excess policy has an "other insurance" provision, which states (in pertinent part), "If OTHER INSURANCE . . . is available to the INSURED covering a loss also covered by this policy . . . the insurance afforded by this policy shall apply in excess of and shall not contribute with such OTHER INSURANCE." To the extent the Court determines that the ACE policy covers the claims against PSI, this provision should limit ACE's obligation to a pro rata share of $1.55 million, which is the amount of the settlement payment in excess of the $3 million in primary coverage from Praetorian and Zurich.

   4.  One distinction between Nationwide and this case is that the indemnity provision in Nationwide required the indemnitor to carry liability insurance to protect itself and the indemnitee equally. Second, the Nationwide holding was based in part on a conclusion that the Alfa policy (issued to the indemnitor) provided primary coverage to the indemnitee, because the indemnitee was an insured under the terms of the policy. This contested issue has not yet been determined in our case. Third, ACE's policy only provides excess coverage; Zurich provided the primary layer of coverage to SNL. In contrast, Alfa provided primary coverage to the indemnitor in Nationwide. Fourth, the Nationwide case did not involve injuries to an employee of one of the parties, or related exclusions. Fourth, unlike ACE in this case, Alfa had exhausted its policy limits in paying a settlement on behalf of its named insured. This distinction does not appear to be relevant to our case, however, because the Court still found that Alfa was liable for a proportional contribution.

   5.  I am not aware of any other issues that have not already been addressed in our brief, although I should reiterate that SNL and ACE deny the validity of the alleged indemnity agreement, and reserve all other defenses previously asserted that do not directly pertain to the apportionment/indemnity issue raised in Praetorian's motion.